
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35915-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LEE CANEDY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Michael Canedy appeals his conviction for attempting to elude a

police vehicle, arguing that he received ineffective assistance of counsel when his trial

lawyer failed to object to lay opinion testimony as to his speed, and made statements in

closing argument that trivialized the State's burden of proof. He also preemptively

challenges any award of costs on appeal and, by motion, asks us to direct the trial court to

strike a criminal filing fee imposed at sentencing. We affirm his conviction and remand

with directions to strike the criminal filing fee.

FACTS AND PROCEDURAL BACKGROUND

At around 10:20 p.m. one evening in late October 2017, Whitman County Sheriff

Deputy Michael Jordan responded to a report that a car was driving erratically in the area

of a grain elevator operation in Rosalia. As he arrived in Rosalia and headed toward the

elevator area, he heard and then saw a car spinning and throwing gravel near the storage facilities. The car was being driven by Michael Canedy, who had two backseat passengers: 16-year-old Grace Ashworth and Mr. Canedy's 19-year-old housemate, Cameron Hunter.

As the deputy approached Mr. Canedy's car, Mr. Canedy turned off his headlights and began driving away, "definitely going over the speed limit," according to Deputy Jordan. Report of Proceedings (RP) at 30. The deputy claims to have activated his emergency lights and siren as soon as Mr. Canedy accelerated away, "in an attempt to stop the driver." *Id.* He would later mark the following exhibit introduced at trial to demonstrate the parking lot area where he first encountered Mr. Canedy and the route Mr. Canedy thereafter followed.



Ex. 3.

Mr. Canedy drove south along a gravel driveway and up and over the facility's scales. He turned left on Fourth Street and traveled east, where he crossed railroad tracks at a speed sufficient to cause his rear wheels to leave the ground and bottom out on the far side of the tracks. At an intersection with Whitman Street (also known as Main Street) the deputy claims Mr. Canedy "blew through the stop sign" and traveled to Fifth Street, where he turned right and finally pulled over. RP at 38.

Mr. Canedy was charged with eluding a police officer. At trial, the State called Deputy Jordan to testify to the foregoing matters and to provide his estimate of Mr. Canedy's speed. He provided the following estimates:

> [THE STATE]: Alright, now as it began to drive away, did you have a sense of how fast it was going?
> DEPUTY JORDAN: It was accelerating quickly um and it was definitely going over the speed limit. I would estimate we reached speeds there of fifty miles an hour.
> [THE STATE]: Okay, not initially fifty, but it got to fifty?
> DEPUTY JORDAN: Yeah, it got up to fifty.

RP at 30. Asked about his own speed, the deputy testified:

> DEPUTY JORDAN: I would say I was going about fifty miles an hour.
> [THE STATE]: Did you get a pace on him?
> DEPUTY JORDAN: I did not.
> [THE STATE]: Or radar?
> DEPUTY JORDAN: I did not.
> [THE STATE]: Um so you're going about fifty, are you keeping up with him? Are you overtaking him?
> DEPUTY JORDAN: No, in this area I was not keeping up or overtaking him.
> [THE STATE]: Uh why not go faster?

3

> DEPUTY JORDAN: That's—
> [THE STATE]: Could your car go faster?
> DEPUTY JORDAN: Oh absolutely yeah.
> [THE STATE]: Why not?
> DEPUTY JORDAN: It was not safe at all.

RP at 33-34. The deputy provided the following description of Mr. Canedy's speed

traveling on Fourth Street:

> DEPUTY JORDAN: I saw as [Mr. Canedy] went over the railroad tracks both him and I were going at pretty decent speed. [Mr. Canedy's] rear tires came off the ground by a few inches and then when he landed on the other side his car bottomed out. I could both hear it and see the car bottom out as it hit the road on the other side of the railroad tracks.
> [THE STATE]: Now, you say going at a pretty good speed. Estimate?
> DEPUTY JORDAN: I would estimate in that distance there we got up to around eighty miles an hour.
> [THE STATE]: Okay.
> DEPUTY JORDAN: And so that's kind of starting there maybe around forty miles an hour or so.
> [THE STATE]: At the railroad track?
> DEPUTY JORDAN: At the railroad tracks, yeah.
> [THE STATE]: Um is it possible—now, let's talk about the eighty mile an hour estimate, is it possible that that estimate is high, that it could have been lower?
> DEPUTY JORDAN: Oh definitely, yeah.
> [THE STATE]: Could it have been as low as three miles an hour?
> DEPUTY JORDAN: As low was [sic] what?
> [THE STATE]: Thirty.
> DEPUTY JORDAN: I think it was much faster than that.

RP at 36-37. The deputy testified that in ignoring the stop sign and turning right onto

Whitman Street, Mr. Canedy was traveling at an estimated 25 m.p.h.

4

The deputy also testified to characteristics of the area that made it unsafe to be driving at such speeds. He described the vicinity of the grain storage facilities as poorly lit with only one streetlight, littered with potholes, and as occupied by randomly parked trucks and equipment. He identified a metal catwalk and a large propane tank along the route as hazards.

Grace Ashworth testified for the State and was also asked about her estimate of Mr. Canedy's speed, despite having had her learner's permit for only six months. She testified:

> [THE STATE]: Um oh speed of the car. So, you have—have you gotten a sense of what twenty-five miles an hour feels like?
> MS. ASHWORTH: Yes.
> [THE STATE]: And a sense of what fifty miles an hour feels like?
> MS. ASHWORTH: Yes.
> [THE STATE]: Were you able to form an opinion, I mean let me first ask this. Did you look at the speedometer, you know, from the backseat, did you look at the speedometer to see what it said or anything?
> MS. ASHWORTH: No.
> [THE STATE]: But were you able to form an opinion, just generally, about how fast the car was going?
> MS. ASHWORTH: It was faster than twenty-five.
> [THE STATE]: Okay, faster than twenty-five. Was it faster than thirty-five?
> MS. ASHWORTH: I'd say so.
> [THE STATE]: Was it as fast as fifty?
> MS. ASHWORTH: Close, but I'm not exactly sure.

RP at 72-73. She testified she did not believe that Mr. Canedy's speed reached 80 m.p.h.

Mr. Hunter was called by the State and testified that he had "no idea" how fast Mr. Canedy was driving before being stopped by Deputy Jordan and "[did] not recall"

5

whether Mr. Canedy stopped at the stop sign at Whitman Street.  RP at 80, 83.  During cross-examination, Mr. Hunter admitted telling defense counsel that Mr. Canedy *had* stopped at the stop sign.  Mr. Hunter testified that the deputy did not activate his emergency lights until Mr. Canedy reached the train tracks.

The sole defense witness was Mr. Canedy's next door neighbor, William Millard, who testified that he was familiar with Mr. Canedy's car, having helped Mr. Canedy with mechanical issues "[f]rom the day he brought [the car] home and had problems with it." RP at 91.  Mr. Millard claimed that he took the car for a drive to check out an acceleration problem earlier on the day Mr. Canedy was arrested.  He testified that at 25 to 30 m.p.h., the car "started missing," and it took him a mile stretch to get the speed up close to 50 m.p.h.  RP at 93.  He diagnosed the acceleration problem as something in the fuel system.

In closing argument, the prosecutor acknowledged to jurors that he had not proved the speed Mr. Canedy was driving, but had proved Mr. Canedy was driving in a rash and heedless manner under the circumstances.  Defense counsel's responsive argument included statements about jurors rendering a verdict based on their "gut," their "feeling," their "conviction," and what they "believe[d] the evidence said to [them]"—argument that Mr. Canedy now argues diminished the State's burden of proof.  RP at 114, 117.

The jury found Mr. Canedy guilty. He was sentenced to 20 days in jail and was ordered to pay a $500 victim assessment, $200 criminal filing fee, and $100 DNA[1] collection fee. He appeals.

ANALYSIS

*Deficient representation is not shown*

Mr. Canedy first argues that he received ineffective assistance of counsel.

Effective assistance of counsel is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To demonstrate ineffective assistance of counsel, a defendant must show both that defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness; and that the deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Failure to establish either prong is fatal, and this court need not consider both prongs if a claim can be disposed of on one ground. *Strickland*, 466 U.S. at 697.

---

[1] Deoxyribonucleic acid.

7

Washington courts strongly presume "that counsel's representation was reasonable." *Estes*, 188 Wn.2d at 458. A claim for ineffective assistance of counsel presents a mixed question of law and fact, which this court reviews de novo. *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015).

Turning first to defense counsel's failure to object to Deputy Jordan's and Ms. Ashworth's estimates of Mr. Canedy's speed, "Where a claim of ineffective assistance of counsel rests on [defense] counsel's failure to object, a defendant must show that an objection would likely have been sustained." *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). And if it is argued that counsel should have objected to lay opinion testimony because of a lack of foundation, the defendant must show not only that the foundation had not *yet* been laid, but that it likely could not have been laid.

A lay witness may testify "in the form of opinions or inferences" if the opinions or inferences are "rationally based on the perception of the witness." ER 701. "A proper lay opinion would include the speed of a vehicle." *State v. Kinard*, 39 Wn. App. 871, 874, 696 P.2d 603 (1985); *Reardon v. Progressive Nw. Ins. Co.*, No. C10-225RSL, 2011 WL 13234275, at *3 (W.D. Wash. Mar. 31, 2011) (court order) (citing *United States v. Mamic*, 90 Fed. App'x 532, 533 (9th Cir. 2004) and *State v. Hunt*, 3 Wn. App. 754, 755, 477 P.2d 645 (1970)); *and see* 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 701.8, at 14-15 (6th ed. 2016) (collecting cases).

Had defense counsel objected to an insufficient foundation, a sufficient foundation could have been laid for both Deputy Jordan's and Ms. Ashworth's opinion testimony. These were not witnesses who had caught a fleeting glimpse of a moving vehicle. Ms. Ashworth was traveling *in* the car. The deputy was pursuing it. Both were in good positions to estimate its speed.

The fact that Ms. Ashworth was a young driver would go to the weight of her testimony, not its admissibility. *E.g.*, *Day v. Frazer*, 59 Wn.2d 659, 663, 369 P.2d 859 (1962); *Hunt*, 3 Wn. App. at 755. Even though relatively inexperienced as a *driver*, she testified that she had experience as a passenger. She lived in a rural area and was familiar with the 20 to 25 m.p.h. speed limits in Rosalia and the 55 to 60 m.p.h. speeds traveled on the rural highways.

Defense counsel likely did not object to their opinions as to speed because he knew a foundation could easily be laid and would only strengthen the two witnesses' testimony.

As for Mr. Canedy's contention that his lawyer minimized the State's burden of proof in closing argument, the argument about which he complains is not addressed to the State' burden of proof, but instead to whether conflicts in the testimony of witnesses Jordan, Ashworth, Hunter, and Millard gave rise to reasonable doubt. The prosecutor

9

admitted in his own closing argument that the witnesses provided different versions of events, but argued, "If there are two witnesses that say different things, you don't have to throw up your hands and say there's more than one view on this issue, we can't decide." RP at 107. He told jurors to look at the court's instruction on factors they could consider in evaluating the testimony of witnesses.[2]

When defense counsel had the opportunity to respond, he tried to persuade jurors that the discrepancy in the testimony *could* be enough to create reasonable doubt:

> We did have different testimony among the witnesses. So, what do you do, right? Well that could be a reasonable doubt. It could very much be. You don't have to consider [inaudible]. You may consider those things that he pointed out in judging the credibility of a witness. But, you alone are the judges of the facts. So, you don't have to consider anything other than your gut instinct [inaudible]. If you've got three witnesses who can't really agree on the basics here, that might be a reason to doubt. Very much so.

RP at 114, and

> That's just, you know, make the decision based on your strength, your feeling, your conviction, what you believe the evidence said to you.

RP at 117.

---

[2] The court had instructed the jury, in part:

> In considering the testimony of any witness, you make take into account the opportunity and the ability of the witness to observe, the witness's memory and manner while testifying, any interest, bias or prejudice the witness may have.

RP at 101.

10

Reasonably read, this argument had nothing to do with the State's burden of proof, which defense counsel dealt with elsewhere in his closing argument. In fact, defense counsel referred to the State's burden of proving its case beyond a reasonable doubt three times. No deficient representation is shown.

*Costs on appeal and criminal filing fee*

Mr. Canedy makes a preemptive argument that we should deny costs on appeal in the event the State substantially prevails. A recent general order of this court announced that our clerk or commissioner will henceforth decide these cost issues. *See* Gen. Order to Rescind (Wash. Ct. App. Feb. 19, 2019).[3]

In a supplemental motion, Mr. Canedy asks us to remand with directions to the trial court to strike the $200 criminal filing fee. A legislative enactment effective June 7, 2018, amended RCW 36.18.020(2)(h) to prohibit imposing the $200 criminal filing fee on indigent defendants. LAWS OF 2018, ch. 269, § 17(2)(h). This amendment applies prospectively to cases pending on appeal, which includes this case. *State v. Ramirez*, 191 Wn.2d 732, 745-49, 426 P.3d 714 (2018). The trial court found Mr. Canedy indigent and appointed him counsel for appeal. The State concedes that Mr. Canedy is entitled to the relief requested.

---

[3] Available at http://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders &div=III.

No. 35915-8-III
*State v. Canedy*

We affirm the conviction and remand with directions to the trial court to strike the criminal filing fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.