IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32654-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| PHILIP PATRICK MOORE, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Philip Moore appeals his convictions for conspiracy to commit first degree assault, first degree assault, and attempted first degree assault. He contends that (1) the evidence was insufficient to support the conviction for conspiracy to commit first degree assault, (2) the trial court erred in instructing the jury on an uncharged means of committing first degree assault and attempted first degree assault, and (3) the trial court erred in imposing restitution without Mr. Moore being present. In a statement of additional grounds for review (SAG), Mr. Moore also contends that his counsel provided ineffective representation by failing to call an exculpatory witness to testify at trial. We disagree and affirm.

FACTS

On September 21, 2013, Philip Moore called Jaimie Nelson who was shopping at Wal-Mart asking her if she would drive him from his home to a location in Spokane Valley. She had received similar requests from Mr. Moore before. She told Mr. Moore that she would have to check with her fiancé, Steven Brown, when she returned home. Mr. Moore sent numerous texts afterwards and was quite persistent. When Ms. Nelson got home, she discussed Mr. Moore's request with Mr. Brown, and Mr. Brown was willing. Ms. Nelson then called Mr. Moore and told him that they were on their way. When they arrived at Mr. Moore's house, they sat down in the living room and Mr. Moore gave Mr. Brown a rock of crack cocaine to smoke.

Unbeknownst to Mr. Brown and Ms. Nelson, Lawrence Adams, a/k/a "Black," had recently arrived at Mr. Moore's house and was hidden in another room. All four people knew each other from buying and selling drugs.

Mr. Brown and Ms. Nelson were avoiding any contact with Black because they knew that Black believed they had stolen items from him. Black had threatened them, including warning Mr. Brown that he would burn his house down and harm his family. Because of their fear, Mr. Brown and Ms. Nelson had called the police and stayed away from town. Mr. Moore also knew that Black believed Mr. Brown and Ms. Nelson had

2

stolen from him. Mr. Moore knew that in the drug world in which he lived, there would be pretty severe consequences to Ms. Nelson and Mr. Brown for ripping off Black.

As Mr. Moore, Mr. Brown, and Ms. Nelson sat around the living room table, Mr. Moore brought up the topic that Black believed the two had stolen from him. At this point, Black came from another room into the living room and said, "[W]hat mother fucker, you didn't think I would find you?" Report of Proceedings (RP) at 66. Black had a three-foot pipe wrapped in duct tape. He began beating Mr. Brown. Mr. Moore joined in as Black continued to assault Mr. Brown until Mr. Brown lost consciousness. Prior to losing consciousness, Mr. Brown was getting spit on, and both Mr. Moore and Black were urinating on him. Mr. Moore and Black were making a game out of the assault, taking turns.

Ms. Nelson, who was witnessing the attack on Mr. Brown went for her cell phone. Black saw this, and swung the pipe at Ms. Nelson's head and face. Black took her phone. Ms. Nelson, with blood in her eye, tried to get up because Mr. Brown had fallen off his chair and was unresponsive and shaking on the floor. Black hit her in the abdomen and she too fell on the floor. Black told her not to move. Black asked Mr. Moore to get him a knife. Mr. Moore returned with scissors. Black cut off Ms. Nelson's hair with the scissors.

3

After the attack, Mr. Moore told Ms. Nelson that she and Mr. Brown would have to get out of his house. Mr. Moore did not call 911, and Ms. Nelson no longer had her cell phone because it was taken during the attack. Mr. Moore and Ms. Nelson dragged an unconscious Mr. Brown outside and placed him in a vehicle. Ms. Nelson drove Mr. Brown to the hospital. Ms. Nelson left the hospital but later returned for medical treatment.

The day after the assault, detectives found a pipe with blood on it in a fenced lot located next to Mr. Moore's home. Deoxyribonucleic acid (DNA) testing of the pipe revealed a match to Mr. Brown's DNA. Detectives also collected a strand of hair with staining on it from Mr. Moore's home. Analysis of the staining on the strand of hair confirmed a major female contributor of DNA matching Ms. Nelson and a minor male contributor matching Mr. Moore.

The State charged Mr. Moore as a principal or an accomplice with conspiracy to commit first degree assault against Mr. Brown and first degree assault against Mr. Brown. The State also charged Mr. Moore as a principal or an accomplice with attempted first degree assault of Ms. Nelson.

At trial, Mr. Moore testified in his own defense. He testified that on September 21, 2013, Ms. Nelson called him because she wanted to come get some drugs

4

from him. Mr. Moore told Ms. Nelson that if she picked him up, he might be able to make some arrangements. He claimed that after the telephone call, he fell asleep for three hours and, by the time he awoke, he did not think Ms. Nelson was coming to his house. He testified that he then called Black to order drugs from him. Black thereafter arrived out his house and, just prior to Black leaving, both Ms. Nelson and Mr. Brown arrived. Black then instructed him to give them some crack, and then Black hid. He claimed that he did not have an agreement with Black to set up a meeting with Mr. Brown and Ms. Nelson so that Black could attack them. He testified, "The only agreement me and Black made was, he asked me if they ever showed up to call him. That was it." RP at 212. Mr. Moore testified that he did not bring everybody together, but rather, "[i]t's just circumstances, situations and issues brought everyone together." RP at 227.

The witness accounts differed regarding Mr. Moore's involvement in the assaults. Mr. Moore testified he did not touch Ms. Nelson or Mr. Brown. He stated Black grabbed the scissors himself and cut Ms. Nelson's hair. Mr. Moore also stated he was outside for most of the attack.

Mr. Brown testified that Mr. Moore "joined in on the attack" and took turns with Black hitting him. RP at 68. Mr. Brown also stated that both Mr. Moore and Black urinated on him.

5

Ms. Nelson testified that Black asked Mr. Moore to get him a knife. Mr. Moore came back with scissors and gave them to Black, who then cut Ms. Nelson's hair. Ms. Nelson also testified that Mr. Moore walked through the living room a few times and watched as the assaults occurred. Finally, she stated that while she was lying on the floor, Mr. Moore and Black discussed raping her with a broom so that Mr. Brown would have to watch, but they did not go through with it.

Both victims and Detective Benjamin Estes also testified regarding the injuries inflicted during the attack. Mr. Brown testified his teeth were broken. He suffered from grand mal seizures, petit mal seizures, and had been in and out of the hospital four or five times since the beating. He had chronic headaches and back pain. Additionally, because of his injuries, he lost his job.

Detective Estes testified that right after the attack, physicians informed him that in all likelihood Mr. Brown was going to die as a result of the severe injuries to his lungs and brain. He had been deprived of oxygen for a long period of time, and he remained on a ventilator because he could not breathe on his own. He also remained in a continuous epileptic seizure the whole time he was in the hospital. The doctors concluded that the beating was severe enough to kill him.

Ms. Nelson testified that when she returned to the hospital, her eye was swollen closed and medical staff determined that her jaw was broken, that she needed six staples to close a gash on the back of her head, that she had a fractured cheek bone so that her cheek was pushed into her face, and that she would have to undergo surgery to have bone removed from the back of her eye.

Mr. Moore testified that he believed Mr. Brown was either dead or would die from the beating. After Ms. Nelson left to take Mr. Brown to the hospital, Mr. Moore began cleaning his apartment because "[t]here was blood all over my walls, over all my floor[,] hair everywhere." RP at 208.

After the evidence was presented, the jury deliberated and returned guilty verdicts on all three charges. The jury also returned special verdicts finding that Mr. Moore was armed with a deadly weapon at the time of the commission of the first degree assault and the attempted first degree assault.

At sentencing, the trial court found that Mr. Moore was a persistent offender and sentenced him to life in prison without the possibility of early release. Defense counsel agreed to leave restitution open for up to 180 days but informed the trial court that Mr. Moore did not waive his right to be present at the restitution hearing. Subsequently, on

7

No. 32654-3-III
*State v. Moore*

August 1, 2014, the trial court entered an order setting restitution at $463.65. The order

shows that defense counsel telephonically approved entry of the order.

Mr. Moore appeals.

ANALYSIS

1.    *Whether sufficient evidence supported Mr. Moore's conviction for conspiracy to commit first degree assault*

Mr. Moore contends that insufficient evidence supports his conviction for

conspiracy to commit first degree assault because the State failed to show any agreement

between him and Mr. Adams to commit first degree assault.

"The State . . . must produce substantial evidence to support the elements of a

crime." *State v. Butler*, 165 Wn. App. 820, 829, 269 P.3d 315 (2012). This court reviews

de novo whether the State has met its burden of production. *Id.* Where a defendant

challenges the sufficiency of the evidence, the reviewing court must "view the evidence

in the light most favorable to the State and determine whether any rational trier of fact

could have found the elements of the charged crime beyond a reasonable doubt." *State v.

Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). The reviewing court must also give

deference "to the trier of fact on issues of conflicting testimony, credibility of witnesses,

and the general persuasiveness of the evidence." *Butler*, 165 Wn. App. at 829.

8

To prove the conspiracy charge, the State had to show that Mr. Moore agreed with one or more persons to cause conduct constituting assault in the first degree, that he made the agreement with the intent that such conduct be performed, and that a person involved in the agreement took a substantial step in pursuance of the agreement. RCW 9A.28.040(1). The agreement can be informal and may even be based on circumstantial evidence. *Butler*, 165 Wn. App. at 834. "Purely circumstantial evidence may be sufficient if it permits the jury to infer beyond a reasonable doubt that the defendant committed the crimes charged." *State v. King*, 113 Wn. App. 243, 269, 54 P.3d 1218 (2002). Circumstantial evidence may consist of declarations, acts, conduct, or concert of action. *Butler*, 165 Wn. App. at 834. Concert of action consists of all the parties working together understandingly, with a single design for the accomplishment of a common purpose. *King*, 113 Wn. App. at 284 (quoting *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987)).

Here, the evidence, viewed in the light most favorable to the State, supports Mr. Moore's conviction as a member of the conspiracy. Mr. Moore knew Black believed that Mr. Brown and Ms. Nelson had stolen from him and believed there would be consequences for them. Mr. Moore had agreed to call Black if Mr. Brown or Ms. Nelson ever came to his house. Mr. Moore called Ms. Nelson on September 21, 2013, and asked

9

her to come to his house to give him a ride. Ms. Nelson said she was not home and would check with her fiancé, Mr. Brown, once she returned home. When she returned home, she spoke with her fiancé, and he agreed. Ms. Nelson then called Mr. Moore and said she and Mr. Brown would be over to give him a ride. At some point, and a jury could believe it was immediately after Mr. Moore's second conversation with Ms. Nelson, Mr. Moore called Black and Black came over to his house. A jury could find, based on this evidence, that Mr. Moore had set the trap. Moreover, Mr. Moore's participation in the attack was another piece of evidence that supported the conspiracy charge. Thus, there was sufficient evidence supporting the jury's conclusion that Mr. Moore agreed with Black to engage in conduct that would constitute first degree assault.

Mr. Moore also argues that Washington law does not allow for conspiracy based on accomplice liability, but he fails to support his argument with any authority directly on point. He cites *State v. Pacheco*, 125 Wn.2d 150, 155, 882 P.2d 183 (1994) for the proposition that "[a] conspiratorial agreement necessarily requires more than one to agree because it is impossible to conspire with oneself." In *Pacheco*, the co-conspirator was an undercover officer, who presumably did not actually agree to commit a crime. There, the *Pacheco* court held that the absence of a bilateral agreement to commit the crime precluded a conspiracy conviction for the crime. *Id.* at 155-59. *Pacheco* is

10

distinguishable. Here, circumstantial evidence shows that Mr. Moore intentionally set up

the meeting between Black and the two victims, knowing that in the drug world in which

they lived, there would be pretty severe consequences for the victims.

2. *Whether the trial court erred in instructing the jury on an uncharged means of committing first degree assault and attempted first degree assault*

Mr. Moore contends the trial court erred in instructing the jury on an uncharged

means of committing first degree assault and attempted first degree assault. "This court

reviews de novo whether a jury instruction accurately states the law without misleading

the jury." *State v. Chino*, 117 Wn. App. 531, 538, 72 P.3d 256 (2003). While Mr. Moore

did not object to the instructions at trial, such an issue involving the omission of elements

of the charged crime is a "'manifest error affecting a constitutional right,'" which this

court may consider for the first time on appeal. *Id.* (quoting RAP 2.5(a)(3)).

There are three alternative means of committing first degree assault.

RCW 9A.36.011 provides:

> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
> (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
> (b) Administers, exposes, or transmits to or causes to be taken by another, poison, the human immunodeficiency virus as defined in chapter 70.24 RCW, or any other destructive or noxious substance; or
> (c) Assaults another and inflicts great bodily harm.

The State charged Mr. Moore with only the third means of first degree assault against Mr.

Brown. The information provided:

> That the defendants, LAWRENCE W. ADAMS and PHILIP PATRICK
> MOORE, as actors and/or accomplices, in the State of Washington, on or
> about September 21, 2013, did, with intent to inflict great bodily harm,
> intentionally assault STEVEN R. BROWN and *did inflict great bodily*
> *harm.*

Clerk's Papers (CP) at 2 (italics added). Yet, the court's instruction on first degree

assault only included the first means, providing: "A person commits the crime of assault

in the first degree when, with intent to inflict great bodily harm, he or she *assaults*

*another with any deadly weapon or by any force or means likely to produce great bodily*

*harm or death.*" CP at 135 (emphasis added). The court also gave a "to convict"

instruction providing that one of the elements the jury needed to find was that Mr. Moore

committed the assault "with a deadly weapon or by a force or means likely to produce

great bodily harm or death." CP at 136.

Additionally, the State charged Mr. Moore with only the third means of attempted

first degree assault against Ms. Nelson. The information provided:

> That the defendants, LAWRENCE W. ADAMS and PHILIP PATRICK
> MOORE, as actors and/or accomplices, in the State of Washington, on or
> about September 21, 2013, did, with intent to commit the crime of First
> Degree Assault as set out in RCW 9A.36.011, committed an act which was
> a substantial step toward that crime, by attempting, with intent to inflict

12

great bodily harm, to intentionally assault JAIMIE R. NELSON and *did inflict great bodily harm.*

CP at 3 (italics added). Yet, the court's "to convict" instruction for attempted first degree assault referenced the court's instruction for first degree assault, which again only included the first means of first degree assault.

However, the State argues that Mr. Moore invited error by requesting the erroneous instructions on first degree assault and attempted first degree assault. The Washington Supreme Court has held, "A party may not request an instruction and later complain on appeal that the requested instruction was given." *State v. Boyer*, 91 Wn.2d 342, 345, 588 P.2d 1151 (1979). Although a "strict rule," appellate courts "have rejected the opportunity to adopt a more flexible approach." *State v. Studd*, 137 Wn.2d 533, 547, 973 P.2d 1049 (1999). Thus, under the doctrine, "even where constitutional rights are involved, [appellate courts] are precluded from reviewing jury instructions when the defendant has proposed an instruction or agreed to its wording." *State v. Winings*, 126 Wn. App. 75, 89, 107 P.3d 141 (2005).

Here, Mr. Moore requested two different instructions for first degree assault, one which instructed on the first means and another on the third means. But the "to convict" instructions he requested for both first degree assault and attempted first degree assault

13

only included the first, uncharged means as a necessary element. Mr. Moore, therefore,

invited instructional error, and we are precluded from reviewing this issue.

3. *Whether the trial court erred in imposing restitution without Mr. Moore being present*

Mr. Moore challenges the restitution order, contending that it was wrongfully

entered in his absence and that he is entitled to a new hearing at which he can participate.

A trial court's authority to impose restitution is statutory. *State v. Gray*, 174

Wn.2d 920, 924, 280 P.3d 1110 (2012) (quoting *State v. Gonzalez*, 168 Wn.2d 256, 261,

226 P.3d 131 (2010)). RCW 9.94A.753 grants trial courts broad authority to order

restitution. *Id.* at 925. RCW 9.94A.753(5) states that a court shall order restitution

"whenever the offender is convicted of an offense which results in injury to any person or

damage to or loss of property." Additionally, "the court shall order restitution in all cases

where the victim is entitled to benefits under the crime victims' compensation act, chapter

7.68 RCW." RCW 9.94A.753(7).

The court's determination of the amount of restitution "must be accurate and may

be accomplished by either (1) the defendant's admission or acknowledgement or (2) a

preponderance of the evidence." *State v. Ryan*, 78 Wn. App. 758, 761, 899 P.2d 825

(1995). "A sentencing court does not need to hold an evidentiary hearing to determine

the proper amount of restitution if a defendant acknowledges or admits to the amount of

14

loss suffered by the victim." *State v. Duvall*, 86 Wn. App. 871, 875, 940 P.2d 671 (1997). But if an offender timely objects, he or she is entitled to a restitution hearing. *Ryan*, 78 Wn. App. at 762. Furthermore, a defendant has a right to be present at sentencing. CrR 3.4(a). The setting of restitution is an integral part of sentencing. *State v. Kisor*, 68 Wn. App. 610, 620, 844 P.2d 1038 (1993).

The judgment and sentence, which Mr. Moore signed, included a statement that the calculation of legal financial obligations "does not include all restitution . . . which may be set by a later order of the court." CP at 185. The judgment and sentence also stated, "An agreed restitution order may be entered." CP at 185.

Subsequently, on August 1, 2014, the trial court entered a restitution order in the amount of $463.65. The order indicates that defense counsel telephonically approved entry of the restitution order. We infer that defense counsel conferred with his client and obtained permission for entry of the order. Otherwise, defense counsel would have objected rather than approve its entry.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se SAG, Mr. Moore contends that his counsel at trial was ineffective. He claims that counsel failed to investigate Amy Mills, his girl friend at the time of the incident, who was listed as an eyewitness in the State's affidavit of facts. He claims he

15

directed counsel to interview Ms. Mills but that counsel failed to do so. Mr. Moore attached a copy of a handwritten letter purportedly written by Ms. Mills in support of his SAG. Mr. Moore contends the letter is "exculpatory in nature, and directly relevant in relation to the outcome of the trial." SAG at 3. In his supplemental SAG, Mr. Moore attached a transcript of Ms. Mills's testimony in the case against Black. Mr. Moore contends this testimony could have changed the outcome of his own trial.

A claim for ineffective assistance of counsel presents a mixed question of law and fact, which this court reviews de novo. *State v. Jones*, 183 Wn.2d 327, 338-39, 352 P.3d 776 (2015). "Competency of counsel is determined based upon the entire record below." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

To demonstrate ineffective assistance of counsel, a defendant must show: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 334-35. There is a strong presumption that counsel's representation was effective. *State v. Weber*, 137 Wn. App. 852, 858, 155 P.3d 947 (2007). However, this presumption may be rebutted "where there is no conceivable

16

legitimate tactic explaining counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

Failure to investigate a witness and also failure to call a witness are both recognized bases for a claim of ineffective assistance of counsel. *Jones*, 183 Wn.2d at 339-40; *Weber*, 137 Wn. App. at 858. But "this court cannot deem the failure to investigate or to call witnesses prejudicial unless the record supports the determination that these witnesses would have been helpful to the defense." *Weber*, 137 Wn. App. at 858.

Where, as here, a claim is brought on direct review, this court will not consider matters outside the trial record. *McFarland*, 127 Wn.2d at 335. The record on appeal is insufficient for this court to consider Mr. Moore's SAG claims. If Mr. Moore wishes to raise issues on appeal that require evidence of facts outside the record, he must raise them in a personal restraint petition. *Id.*

In summary, we affirm Mr. Moore's conviction for conspiracy to commit first degree assault, hold that the instructional errors were invited and not reviewable, and that the restitution amount was approved by Mr. Moore prior to entry of the restitution order.

17

No. 32654-3-III
*State v. Moore*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____       _____
Siddoway, C.J.                        Brown, J.