

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35573-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY W. COUNTS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Jeffrey Counts appeals his convictions for second degree rape of a child and second degree child molestation. The offenses were committed against his 12-year-old niece, who had been placed with Jeffrey and his wife, Susan,[1] for possible adoption. He challenges the trial court's refusal to grant a continuance of trial, and alleges that his trial lawyer failed in several respects to provide an effective defense response to the testimony of a forensic nurse called by the State.

---

[1] In providing background, we refer to Jeffrey and Susan Counts by their first names for clarity. We intend no disrespect.

The trial court did not abuse its discretion in denying what would have been the seventh continuance of trial, and Mr. Counts fails to demonstrate that his trial lawyer's representation was ineffective. We affirm the convictions. In light of Mr. Counts's indigence, we grant his motion requesting that a criminal filing fee be stricken from his judgment and sentence.

## FACTS AND PROCEDURAL BACKGROUND

In early 2012, Jeffrey Counts learned that he and his wife Susan had an 11-year-old niece, the daughter of his half sister. The niece, whom we will refer to pseudonymously as Sara, was a dependent of the State of Nevada, which was trying to place her for possible adoption. At the time, Jeffrey was 51 years old and Susan was somewhat older; both had adult sons by prior marriages. They nonetheless agreed to the placement and Sara moved in with them in the summer of 2012. She was 11 years old at the time, and entered sixth grade in the fall.

Pursuant to an interstate agreement, Washington's Department of Social and Health Services assigned Shirley Dicus, a Washington-based social worker, to contact Jeffrey and Susan at least every 30 days to facilitate the placement. She arranged for a mental health therapist, Cindi Fuller, to work with the family.

By all accounts, there were no problems with the placement during Sara's sixth grade year, but parenting problems became apparent when Sara, then age 12, entered the seventh grade. Susan was doing most of the day-to-day parenting because Jeffrey, a

2

flatbed truck driver, was away from home for two to three days at a time. Sara started

doing less well in school, became argumentative, and even threw her phone at Susan one

night when being disciplined for using it after bedtime, in violation of house rules. Over

Susan's objections, Jeffrey and Sara would communicate privately by text even when

sitting in the same room. (Susan did not object to them texting when Jeffrey was

traveling.)

At a meeting with Susan, Jeffrey, and Sara on November 6, 2013, Ms. Dicus

learned that one of the ways Jeffrey was "bonding" with Sara was by rubbing her back at

bedtime and "popping her toes." Report of Proceedings (RP) at 136. Ms. Dicus told

Jeffrey that it was inappropriate and if continued, it would be viewed negatively by the

state agencies. A couple of months later, at a meeting with the family on January 15,

2014, Ms. Dicus became more concerned when, toward the end of a meeting with the

family, she saw Sara reach out with her foot and touch Jeffrey on the back of the leg and

witnessed Jeffrey respond with what she characterized as "quasi-sexual play." RP at 154.

She later described it at trial:

> His response . . . was to turn and basically kind of climb on top of her, and
> he was kind of, like, wrestling with her. Both of his feet were off of the
> ground. And everyone kind of then froze, and he rolled away from her, got
> up, went to his chair, acted embarrassed.

RP at 137.

Two days later, Ms. Fuller had a counseling session with the family. She was concerned at that point with a dynamic in which she felt Sara was "taking control of [the] family," which she felt could disrupt the placement. RP at 243. She would later describe it as "parent splitting":

> If Susan didn't do what [Sara] wanted, she would call Jeffrey. Jeffrey let her do what she wanted to do. It was good cop/bad cop. . . . They would be sitting in the house texting each other. She was really at—he put her—it felt like, as a professional, if that was me, as if he put her at the same level as Susan.

RP at 243-44. She told Jeffrey at the January 17 meeting that he needed to stop going into Sara's bedroom at night to give her back rubs and should not be alone with Sara at any time. His reaction was defensive. At that point, Ms. Fuller recommended that Sara be removed from the family.

Sara was removed from the Countses' home on February 11, 2014, and was returned to Nevada. About a month later, Sara wrote a letter to her foster parent, telling her that Jeffrey had touched her inappropriately and raped her. Her allegations were reported to law enforcement. She was interviewed first by a detective from Carson City, Nevada, and in August 2014, having been relocated to Arizona, was examined and questioned by a forensic nurse, Susann Clinton. Sara reported that the bedtime routine at the Countses' home was for Jeffrey and Susan to come into her room to say a prayer, after which Susan would leave to watch television or go in her bedroom, and Jeffrey would remain to rub her back. She said that in the summer of 2013, when she was 12,

4

Jeffrey began touching her genital area, and would insert his fingers inside her. She said that once started, it happened "pretty frequently" when he was home. RP at 82.

She reported that he ultimately raped her one day in January 2014, after the family had driven to an urgent care center so that Susan could receive care for a broken finger. Sara claims that when Susan was taken for X-rays, Jeffrey drove her home, "dragged me into my room and threw me on my bed and raped me." RP at 85. Susan would later confirm that she had expected Jeffrey and Sara to wait for her at the urgent care center and was surprised, when X-rays were completed, that Jeffrey had left for home.

The night of the urgent care visit, Susan got up in the middle of the night and encountered Jeffrey leaving Sara's bedroom. She reminded him of their agreement with the state agencies that he would stay out of Sara's room, and asked why he was there. He said he was only trying to make Sara comfortable.

Sara later explained why she never told anyone about the abuse until a month after she was removed from the Countses' care:

> Well, I mean, like, at first, like, when things like that weren't happening, like, the inappropriate things, like, it was good. And then even after that, like, if I told somebody I didn't like it, I felt like they would ask me why and then I'd have to give a reason; and then I'd be taken out of there and I don't know where I would go, and I was scared. So I just didn't tell anyone.

RP at 128.

5

Jeffrey was not charged until February 2016. He was charged with one count of second degree rape of a child and one count of second degree child molestation. Each count included an aggravating factor alleging the crime was part of an ongoing pattern of sexual abuse of the same victim.

Trial was initially set for May 9, 2016. Between April 2016 and April 2017, six continuances were granted by the trial court because Jeffrey's lawyer needed more time to gather information. On June 7, 2017, five days before a June 12 trial date, defense counsel requested another continuance. While the State did not object, the trial court denied the request, explaining that other peoples' interests were at stake, including the victim's. By the time of the 2017 trial, Sara was in the 11th grade. The court stated that it was "not taking . . . lightly" defense counsel's stated need for additional trial preparation, and would "assist in making the work as flexible as possible." RP at 13.

On the first morning of trial, counsel reported that Jeffrey's lawyer had not had the opportunity to interview Ms. Clinton, the forensic nurse, and Jeffrey had identified a new witness who had not yet been interviewed by the State. The court stated, "Before either of these witnesses are examined, opposing counsel must have an opportunity to interview them." RP at 17. Ms. Clinton was not called as a witness until three days later. Jeffrey concedes that the defense had the opportunity to interview Ms. Clinton before she testified on Thursday, June 15.

Sara, Ms. Dicus, and Susan Counts were called as the first three State witnesses.

Their testimony included matters recounted above.  Sara also identified an exhibit that

reproduced some of the text messages she had exchanged with Jeffrey.  In one, Jeffrey

had told her in a teasing tone that she needed to worry about him.  Ex. 2.  Their exchange

continued:

> [Sara]:  Y do I have to worry about u
> [Jeffrey]:  Cause.  Lol
> [Jeffrey]:  I will tell you saturday at about four am.  :-)
> [Sara]:  No dont wake me up u jerk!  I wana sleep
> [Jeffrey]:  So now im a jerk?
> [Sara]:  Cuz ur gonna wake me up
> [Jeffrey]: I know you really want me to wake up.
> [Sara]:  No i don't i wanna sleep thank u
> [Jeffrey]:  You want me rub your back.
> [Sara]:  No id rater sleep!especially on saturdays
> [Jeffrey]:  Thats too bad then.
> [Sara]:  Whats too bad then
> [Jeffrey]:  Well just have to see the[n][2]
> [Sara]:  See what?!?
> [Jeffrey]:  What do you think.
> [Sara]: Idk!

---

[2] Jeffrey testified at trial that what appeared as "them" was a typo, and should have been "then."  RP at 290.

Ex. 2 (reformatted; electronic signatures omitted). In the text exchange, Sara continued to press Jeffrey to tell her what it was they would "just have to see," and he responded, "I can't . . . Because its [sic] between you and me." *Id.*

Ms. Clinton appeared telephonically as the State's fourth witness. She identified herself as a family nurse practitioner employed in the Children's Health Center of Flagstaff Medical Center. She testified that when she examined Sara in August 2014, Sara announced at the outset that she "didn't want to talk about" what brought her to the center and, "[S]he wanted me to ask other people." RP at 207. Relenting somewhat, Sara asked Ms. Clinton to ask her only "yes [or] no" questions, which, for the most part, Ms. Clinton did. RP at 208. In its direct examination, the State questioned Ms. Clinton about Sara's answers to her questions. Ms. Clinton testified that when asked who Jeffrey was, Sara answered he was "a pervert." *Id.* She testified that Sara answered that Jeffrey had touched her genital area with his hands and had touched inside her genital area; that he touched her with his penis, something came out of his penis, and she was really sore afterward; and that the sexual contact occurred at first two or three times a week and then on Saturdays. Ms. Clinton testified that she had physically examined Sara and that her anal-genital area did not show any signs of trauma. She testified this is common in child sexual abuse cases.

Defense counsel did not object that the questioning of Ms. Clinton was cumulative or unduly prejudicial. On cross-examination, defense counsel obtained Ms. Clinton's

8

agreement that in interviewing a child it is best not to ask leading, or "yes or no" questions, and that Ms. Clinton had asked a lot of such questions.

Ms. Fuller was the State's last witness, after which Jeffrey testified as the sole witness in the defense case. He denied engaging in any sexual contact with Sara, admitting only that he had not abided by Ms. Dicus's and Ms. Fuller's warnings about maintaining appropriate boundaries. He described himself as "dumbfounded" by their warnings because of his religious belief in the importance of family and the fact that he had fathered only sons and was "ignoran[t] on how to raise a daughter." RP at 296.

The jury found Jeffrey guilty as charged and answered yes to the special verdicts on the aggravating factor. He appeals.

ANALYSIS

Mr. Counts makes three assignments of error, which we address in the order they occurred at trial: he challenges (1) the denial of his request for a seventh trial continuance, and (2) the constitutional adequacy of his representation where his lawyers (a) failed to interview Ms. Clinton before trial and therefore failed to secure a rebuttal expert, and (b) failed to object that Ms. Clinton's testimony was cumulative and unduly prejudicial. We then turn to his motion to strike fees from his judgment and sentence.

I.      THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING A FURTHER
        CONTINUANCE OF TRIAL

In requesting a further continuance of trial on the Wednesday before a Monday,
June 12 trial date, defense counsel told the court that he and his investigator had recently
telephonically interviewed Sara and completed a second interview of Susan Counts, and
"[b]ased upon those conversations, we have determined . . . there are more avenues that
we need to explore, records that we need to attempt to acquire." RP at 8. He told the
court he could not provide Mr. Counts an adequate defense if the trial proceeded as
scheduled. He emphasized the fact that Mr. Counts's only prior conviction was a "third
degree suspended in 1997" and given Mr. Counts's age—56 at the time of trial—he was
looking at what "could actually be a life sentence." RP at 7. Defense counsel argued that
Mr. Counts, who was not in custody, would not be prejudiced.

The trial court denied the continuance even though the State had no objection. Mr.
Counts now argues that given the seriousness of the crime and defense counsel's lack of
familiarity with the case, no reasonable judge would have denied Mr. Counts a
continuance.

"[T]he decision to grant or deny a motion for a continuance rests within the sound
discretion of the trial court." *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169
(2004). In exercising this discretion the trial court may consider factors such as "surprise,
diligence, redundancy, due process, materiality, and maintenance of orderly procedure."

10

*Id.* at 273. Denying "a request for a continuance may violate a defendant's right to compulsory [due] process if the denial prevents the defendant from presenting a witness material to his defense." *Id.* at 275. This court "will not disturb the trial court's decision unless the appellant . . . makes 'a clear showing . . . [that the trial court's] discretion [is] manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Id.* at 272 (alterations in original) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

In denying the continuance request, the trial court cited the six prior continuances, the fact that "it couldn't have been a surprise that we are going to trial," and the interests of other individuals involved in the case, including the victim. RP at 11. Most of its oral ruling addressed its belief that defense counsel's needs could be accommodated. It noted that the projected trial time was 3.5 days, "[b]ut if circumstances arise that require a different allocation of time, we understand that." RP at 12. It pointed out that significant time for jury selection and motions in limine was to be expected, and

> I'm also very willing to assist in making the work as flexible as possible so long as each party has an opportunity to explore. If there's something new, some new witness, the opposing party will definitely be required to have access to the witness for at least an interview. So we'll try to move forward on that basis.

RP at 13.

Defense counsel never identified the avenues he hoped to explore or records he sought to obtain, so there is no demonstration that Mr. Counts was prevented from

11

presenting evidence material to his defense. Although defense counsel bore no responsibility for the passage of time before charges were filed, the fact remained that it had already been over three years since Sara had reported the abuse, and the trial court was legitimately concerned with her interests and the need for orderly procedure.

Perhaps most importantly, the trial court observed that with five days remaining before trial and its own willingness to make accommodations for any surprises, the defense would not be prejudiced if held to the trial date. On the morning of the first day of trial, defense counsel informed the court that he had met with the prosecutor "a couple of times over the weekend, couple [of] times on Friday," and was "ready to proceed at this time." RP at 15-16. He was assisted at trial by a second public defender, who handled the cross-examination of three of the State's witnesses. No abuse of discretion is shown.

II.     TRIAL COUNSEL DID NOT PROVIDE INEFFECTIVE ASSISTANCE OF COUNSEL

    A.     Mr. Counts does not demonstrate that he was prejudiced by his trial lawyer's failure to interview Susann Clinton before trial

Mr. Counts contends his trial lawyer was ineffective when he failed to interview Susann Clinton before trial, which he contends led to his failure to procure a rebuttal expert.

Effective assistance of counsel is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v.*

*Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).  To demonstrate ineffective assistance of counsel, a defendant must satisfy a two-pronged test.  *Id.*  A defendant must show:

> (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  Failure to establish either prong is fatal, and this court need not consider both prongs if a claim can be disposed of on one ground.  *Strickland*, 466 U.S. at 697.  A claim for ineffective assistance of counsel presents a mixed question of law and fact, which this court reviews de novo.  *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015).

On the morning of the first day of trial, defense counsel informed the court he had not yet interviewed Ms. Clinton and his investigator would be attempting to contact her. He acknowledged that he had received Ms. Clinton's records and her curriculum vitae. He informed the court that "based upon what she [tells] us, there's a possibility that we may want to have a medical professional rebuttal witness.  That person is unknown at this point in time."  RP at 16.  The defense thereafter interviewed Ms. Clinton before she testified.  It did not call a rebuttal witness or request a continuance in order to retain one.

13

Effective assistance requires defense counsel to investigate the case, including by interviewing witnesses. *Jones*, 183 Wn.2d at 339. Because the defense had Ms. Clinton's records before trial, it could have concluded there was no need to interview her early, as long as she could be interviewed before she testified. It knew from her records what she had learned from examining Sara. It had already interviewed Sara. An inability to interview Ms. Clinton was not identified by defense counsel as a reason for his final trial continuance request. "[S]crutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness." *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).

Mr. Counts nonetheless argues that "[i]f counsel had interviewed Clinton prior to trial he would have known that Clinton asked leading questions, and known that an expert could have addressed the lack of reliability of asking children leading questions." Br. of Appellant at 17. Ms. Clinton's records were not entered into evidence, but it is reasonable to believe they reflected Sara's request to be asked only "yes or no" questions. By the time Ms. Clinton testified, the defense was aware of her use of "yes or no" questions and effectively cross-examined her about why open-ended questioning of child witnesses is better practice.

In notifying the court on the first day of trial that the defense might call a rebuttal witness, defense counsel did not express concern that it might be too late to identify one. The trial court had signaled that it would make scheduling accommodations as needed.

14

Mr. Counts does not demonstrate that the decision not to call a rebuttal expert was not

tactical, based on a belief that Ms. Clinton's concessions about leading questions were

sufficient. Deference is given to defense counsel's "decision against calling [a] witness[ ]

if that lawyer investigated the case and made an informed and reasonable decision against

. . . calling a particular witness." *Jones*, 183 Wn.2d at 340 (emphasis omitted).

Mr. Counts does not demonstrate that an earlier interview of Ms. Clinton would

have provided evidence necessary to his defense that became unavailable as a result of

delay. He fails to demonstrate either the deficient representation or the prejudice

necessary for an ineffective representation of counsel claim.

     B.     Mr. Counts does not demonstrate that he was prejudiced by his trial
              lawyer's failure to object to Ms. Clinton's testimony as cumulative and
              unduly prejudicial

Mr. Counts contends his trial lawyer was ineffective for failing to object to Ms.

Clinton's testimony about what she was told by Sara. He concedes that while hearsay,

Sara's answers to Ms. Clinton's questions fall within the medical diagnosis exception to

the hearsay rule. ER 803(a)(4). For the first time on appeal, however, he argues that

evidence of her statements to Ms. Clinton was unnecessarily cumulative and only served

to bolster Sara's credibility. "Although relevant, evidence may be excluded if its

probative value is substantially outweighed by the . . . needless presentation of

cumulative evidence." ER 403.

"Where a claim of ineffective assistance of counsel rests on [defense] counsel's failure to object, a defendant must show that an objection would likely have been sustained." *State v. Fortun-Cebada*, 158 Wn. App. 158, 172, 241 P.3d 800 (2010). Since Mr. Counts challenges his trial lawyer's failure to object conclusorily, he does not direct us to specific testimony to which an objection would likely have been sustained. In child sexual abuse cases, it is not per se objectionable for the State to call not only the child victim but other individuals to whom the child reported abuse. The testimony of other individuals might present different views or perspectives. *E.g.*, *State v. Dunn*, 125 Wn. App. 582, 105 P.3d 1022 (2005); *State v. Smith*, 82 Wn. App. 327, 333, 917 P.2d 1108 (1996), *overruled on other grounds by Portuondo v. Agard*, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000) ("[E]vidence relating to a material issue is not needlessly cumulative . . . simply because it comes in through several witnesses whose accounts are consistent."). The testimony of others might cover additional information not covered in the victim's trial testimony. *E.g.*, *State v. Bedker*, 74 Wn. App. 87, 93, 871 P.2d 673 (1994).

Moreover, ER 403 authorizes the trial court to exclude relevant evidence that is "needlessly" cumulative. The trial court was aware that the State only intended to call five witnesses, and Ms. Clinton would be the only witness in the State's case in chief to whom Sara had described the abuse. The Carson City detective had not been identified

16

as a trial witness, and the State reported that the foster parent to whom Sara wrote a letter reporting the abuse "would be a rebuttal witness, if at all." RP at 22. Ms. Clinton's direct testimony comprises only 19 pages of the trial transcript. If the trial court perceived some of Ms. Clinton's testimony as cumulative, it might not have viewed it as "needlessly" cumulative, given these circumstances.

Finally, even if Mr. Counts's lawyer believed that some of the information provided by Ms. Clinton was cumulative, she[3] might have made the tactical decision not to object. Defense counsel's decision of "whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). Objecting to telephonic testimony can be cumbersome because the witness cannot see counsel and people end up talking over one another, increasing the likelihood of annoying the court or the jury. Objections were likely to be overruled if the trial court could not recall exactly what Sara said in her earlier testimony, because of the likelihood that Ms. Clinton was providing a different perspective or additional information. It was going to be a short trial and Ms. Clinton would be the only witness other than Sara to testify to Sara's allegations, so jurors might have viewed objections from defense counsel as an effort to

---

[3] The defender assisting Mr. Counts's court-appointed lawyer handled the cross-examination of Ms. Clinton.

17

No. 35573-0-III
*State v. Counts*

hide important information. Mr. Counts fails to demonstrate that tactical considerations could not explain a decision not to object.

III.    MOTION TO STRIKE COURT FEES

In sentencing Mr. Counts, the court imposed $800 in legal financial obligations (LFOs) consisting of a $500 victim assessment, $200 criminal filing fee, and $100 DNA[4] collection fee. Relying on *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), which was decided after Mr. Counts filed his opening brief, he has filed a motion to strike the criminal filing and DNA collection fees. *Ramirez* holds that amendments made in 2018 to Washington's legal financial obligation system, which provide relief to offenders in a number of respects, apply prospectively to cases on direct review. *Id.* at 749-50.

The 2018 amendments prohibit imposition of a $200 criminal filing fee on defendants who are indigent at the time of sentencing as defined by RCW 10.101.010(3)(a)-(c). RCW 36.18.020(2)(h). Mr. Counts was found by the trial court to be indigent for purposes of appeal.

The amendments prohibit the assessment of a DNA database fee if the State has previously collected the defendant's DNA as a result of a prior conviction. RCW 43.43.7541. Mr. Counts's motion asserts that he has a prior felony that would have resulted in DNA collection, but the record indicates that he does not.

---

[4] Deoxyribonucleic acid.

18

No. 35573-0-III
*State v. Counts*

We grant Mr. Counts's motion in part and direct the trial court to strike the $200 filing fee from his judgment and sentence.

The convictions are affirmed and the case remanded with directions to strike the criminal filing fee.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, A.C.J.

19