IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 84711-2-I |
| GUSTAVO JEREMY MCDONALD, | UNPUBLISHED OPINION |
| Petitioner. | |

BOWMAN, J. — Gustavo Jeremy McDonald seeks relief through this personal restraint petition (PRP) from his jury conviction for one count of first degree rape of a child. He argues his trial attorney was ineffective for failing to interview or thoroughly cross-examine a forensic interviewer pretrial, failing to object to witness vouching at trial, and failing to call an expert on child memory. We deny his petition.

FACTS

In fall 2015, eight-year-old J.L. told her mother that McDonald, her step-great-grandfather, sexually assaulted her. J.L.'s mother called the police, who investigated the allegations and facilitated a child forensic interview with Heidi Scott.

About two weeks later on October 13, 2015, Scott interviewed J.L. about her disclosure and brought a facility dog to the interview. J.L. told Scott that the assault occurred about two years earlier when she was in the first grade. During that time, she often stayed at her great-grandparents' apartment. On the day of

the assault, J.L.'s great-grandmother Irma Maldonado went to the store while J.L. watched a movie in McDonald's bedroom. After Maldonado left, McDonald entered the bedroom, asked J.L. about the color of her underwear, and told her to take them off. J.L. complied, and McDonald orally sexually assaulted her. J.L. immediately told Maldonado about what happened when she returned from the store. Maldonado then confronted McDonald[1] but did not report the incident to J.L.'s parents or the police. Maldonado told J.L. not to tell anyone about what happened.

In 2018, the State charged McDonald with one count of first degree child molestation. McDonald hired attorney Courtney Will to represent him. As part of discovery, Will received a video and transcript of Scott's forensic interview with J.L. At the beginning of the interview, Scott tells J.L. that she can invite the facility dog "up there with you" on the couch. J.L. then talks about having puppies of her own. When Scott asks what kind of puppies, J.L. explains she does not actually have puppies, but "I imagine in my dream so, and I'm gonna have a new puppy soon."

Will then interviewed J.L. on October 4, 2019. During the interview, J.L. told Will that she eventually disclosed the assault to her mother when she "started having nightmares about it." Based on this information and J.L.'s earlier statement to Scott that she dreamed about having a puppy, Will developed a theory that J.L. misremembered the rape and "mistook a dream for reality." Will

---

[1] J.L. told Scott that she could hear Maldonado "screaming" and "yelling" at McDonald in Spanish.

researched "memory, suggestibility, and source monitoring"[2] and consulted an expert in the field.

On March 8, 2020, the prosecutor disclosed new witness statements to Will. The prosecutor told Will:

1.  I asked J.L. what her answer would be if someone had suggested that this incident was a dream. J.L. stated that it was not a dream. She stated she know[s] the difference between a dream and reality and that she doesn't feel the actual touching in a dream. . . .

2.  I spoke with Heidi Scott about her training and experience about susceptibility of children and she talked to me about source monitoring. She indicated source monitoring is more applicable to children ages [three] to [five] where susceptibility is higher. Source monitoring is not as much of a concern when the child is [eight years old].

On March 9, 2020, Scott testified at a child hearsay evidentiary hearing. She explained how she conducts forensic interviews in general and, specifically, her interview with J.L. Will cross-examined Scott about her experience and knowledge related to memory and source monitoring. That same day, the State amended the charge to rape of a child in the first degree. After the evidentiary hearing, Will decided not to separately interview Scott. And he chose not to retain an expert on memory for trial.

The case proceeded to a jury trial in October 2020. During trial, J.L. testified in detail about the rape. The State also called J.L.'s mother, a Lynnwood Police Department officer and detective, an advanced registered

---

[2] In support of his PRP, McDonald provides the declaration of board certified forensic psychologist Caroline Carr, who describes "source monitoring" as "the set of cognitive processes in which memories are attributed to a particular source of origin" and a person's ability "to accurately identify the source of a given memory."

nurse practitioner, and Scott.  Scott testified about her forensic interview with J.L.  And she testified about how juvenile memory recall and source monitoring impact her interview process.  The State played the video of Scott's interview with J.L. for the jury.

 On cross-examination, Will asked Scott about her training and education related to memory and source monitoring.  Scott could not remember many specific articles or studies from her training, nor could she answer Will's questions about the psychological concepts associated with memory.  Scott explained that her expertise is in forensic interviewing, not psychology.  Scott admitted that she could not determine whether J.L.'s disclosure flowed from a false memory.

The jury found McDonald guilty of first degree rape of a child.  The court sentenced McDonald to a standard-range indeterminate sentence of 102 months to life in prison.  McDonald appealed, challenging as unconstitutionally vague a community custody condition that prohibited him from forming relationships with families who have minor children.[3]  We agreed with McDonald and remanded for the trial court to modify the condition.[4]

McDonald then timely filed this PRP.

ANALYSIS

McDonald argues that Will was ineffective because he failed to "properly investigate and refute testimony presented by the [S]tate concerning memory,

---

[3] *State v. McDonald*, No. 82086-9-I (Wash. Ct. App. Nov. 22, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/820869.pdf.

[4] *McDonald*, No. 82086-9-I, slip op. at 1-2.

suggestibility, and source monitoring errors in children," failed to object to witness vouching at trial, and did not call an expert witness on memory. We address each of his arguments in turn.

1. Standard of Review

Relief through a PRP is extraordinary. *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). A petitioner may seek relief through a PRP when he is under "unlawful [ ] 'restraint.' " RAP 16.4(a).[5] A petitioner seeking relief from an alleged constitutional error must show by a preponderance of the evidence that the error actually and substantially prejudiced him. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004); *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 821, 408 P.3d 675 (2018).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). An ineffective assistance of counsel claim presents mixed questions of law and fact that we review de novo. *State v. K.A.B.*, 14 Wn. App. 2d 677, 707, 475 P.3d 216 (2020) (citing *State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018)). To establish ineffective assistance of counsel, a petitioner must show (1) that defense counsel's performance was deficient and (2) that the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687. If a

[5] Under RAP 16.4(b), a petitioner is under "restraint" when, as here, he "has limited freedom" because he "is confined . . . resulting from a judgment or sentence in a criminal case."

petitioner fails to satisfy either of the *Strickland* prongs, we need not address the other. *Id.* at 697.

Under *Strickland*, a petitioner proves deficient representation by showing that defense counsel's representation fell " 'below an objective standard of reasonableness based on consideration of all the circumstances.' " *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). The petitioner must overcome the strong presumption that trial counsel's representation was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). To rebut this presumption, a petitioner must show that "there is no conceivable legitimate tactic explaining counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). If we can characterize trial counsel's conduct as legitimate trial strategy or tactics, it does not constitute deficient representation. *Kyllo*, 166 Wn.2d at 863.

To determine whether deficient performance resulted in prejudice, we apply the same standard in a PRP as we do on appeal. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 845-47, 280 P.3d 1102 (2012). That is, a successful ineffective assistance of counsel claim satisfies the PRP's actual prejudice requirement. *Id.* at 846-47. To show prejudice, a petitioner must show that there is a reasonable probability that " 'but for counsel's deficient performance, the outcome of the proceedings would have been different.' " *Estes*, 188 Wn.2d at 458 (quoting *Kyllo*, 166 Wn.2d at 862); *Strickland*, 466 U.S. at 694.

2. Failure to Investigate

McDonald argues that Will was ineffective for failing to adequately investigate his case because he did not interview Scott before trial or thoroughly cross-examine her at the child hearsay hearing. We disagree.

An attorney's failure to investigate or interview a particular witness can amount to deficient performance. *State v. Jones*, 183 Wn.2d 327, 339-40, 352 P.3d 776 (2015). "[A] defendant seeking relief under a 'failure to investigate' theory must show a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel." *Davis*, 152 Wn.2d at 739. We "will not defer to trial counsel's uninformed or unreasonable failure to interview a witness." *Jones*, 183 Wn.2d at 340. But if trial counsel investigates the case and makes an informed and reasonable decision not to interview or call a particular witness, we defer to that decision as a strategic choice. *Id.*

In a declaration filed with McDonald's PRP, Will explains that he chose not to interview Scott because he had a video and transcript of her forensic interview with J.L. and expected her testimony at trial to be limited to that interview. He also says he "was able to preview Ms. Scott's trial testimony" through cross-examination at the child hearsay hearing, so he "did not anticipate that a pretrial interview . . . was needed for an effective defense."

Because Will's decision not to interview Scott was informed by his review of the video and transcript of J.L.'s forensic interview and the information he

gained from cross-examining Scott at the pretrial hearing, we defer to his reasonable strategic choice.[6]

Still, McDonald argues that Will's cross-examination at the child hearsay hearing was deficient. He contends Will should have used the hearing to "explore the scope of Ms. Scott's expertise, her opinions or the bases for the same." But the record shows that Will did question Scott about her knowledge and experience with memory, source monitoring, and suggestibility:

> Q. Then in some of your training and experience you talked about, was there any training that you had or have had in the field of memory?
> A. Well, generally memory as it pertains to child interviewing is incorporated in some of that training.
> Q. What is that?
> A. So types of memory — do you mean the training?
> Q. Both.
> A. So in forensic interviewing often the memory set of script versus episodic free recall is all wrapped up into the research presented.
> Q. And do you have specific literature that you rely on?
> A. In regard to memory outside of forensic interviewing or as a whole?
> Q. Do you have — do you have memory outside of forensic interviewing?
> A. It is hard to answer specifically, because it is all intertwined within forensic interviewing, how to elicit different memory sets as previously regarding script and episodic on the most basic levels.
> Q. But that is the actual literature on that that you have, that you review and research for that?
> A. Correct.
> Q. And I didn't see anything in your CV [(curriculum vitae)] either about source monitoring; do you get into that as well?
> A. Correct. It is all encompassed within the realm of child interviewing.
> Q. You have literature that you refer to for that specific type of training?
> A. For source monitoring, correct.

---

[6] We note that Will also interviewed J.L. in October 2019 and consulted a memory expert as part of his investigation.

As stated above, Will reviewed Scott's CV, which showed her training and work experience. And he knew from the State's March 8, 2020 disclosure that Scott knew about source monitoring, but she believed that it was "more applicable to children ages [three] to [five] where susceptibility is higher" and "not as much of a concern when the child is [eight years old]."

McDonald fails to show that a pretrial interview of Scott or a more thorough cross-examination would have produced useful information not already known to Will. We reject McDonald's challenge to Will's investigation as ineffective.

3. <u>Failure to Object to Witness Vouching</u>

McDonald claims Will was ineffective for failing to object to portions of Scott's trial testimony that he alleges improperly vouched for J.L. We disagree.

A petitioner alleging ineffective assistance of counsel for failure to object must show that the court would likely have sustained the objection. *Davis*, 152 Wn.2d at 714.[7] A witness may not vouch for the credibility of a victim because credibility is the province of the jury. *State v. Warren*, 134 Wn. App. 44, 52-53, 138 P.3d 1081 (2006) (quoting *State v. Jones*, 71 Wn. App. 798, 812, 863 P.2d 85 (1993)), *aff'd*, 165 Wn.2d 17, 195 P.3d 940 (2008). In determining whether testimony rises to the level of impermissible vouching, we look to (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the nature of the defense, and (5) other evidence before the trier of fact. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).

---

[7] A petitioner must also show that the failure to object fell below prevailing professional norms. *Davis*, 152 Wn.2d at 714.

At trial, Will questioned Scott on cross-examination about how dreams could impact a child's memory. So, on redirect examination, the prosecutor asked Scott "whether or not [J.L.]'s responses are particularly suggestible or would indicate that she was particularly suggestible." Scott answered, "No." This led to the following exchange:

> Q        Okay. And would you agree that you can't tell whether or not [J.L.] was having a false memory or not in this case?
> A        No. I don't make that determination.
> Q        Okay. And you indicated that the source monitoring you discussed in terms of a child forensic interview is different than what is learned in the field of psychology.
>          Can you tell us what you mean? What's the difference?
> A        Yeah. So I'm not analyzing the child's statements in terms of, like, a psychological perspective. I'm a trained forensic interviewer and I use these techniques to help formulate questions that I ask. I don't determine or dive into the sources of the memory unless something triggers as especially concerning. I might ask more specific questions about that one topic. But again, I'm not a psychologist. I'm a forensic interviewer.
> Q        And you also discussed source confusion and it being common in young children.
> A        Yes.
> Q        What is the age group that you're referring to?
> A        Preschool age. Three to five.
> Q        Three to five. Okay.
>          Were there any examples during your interview with [J.L.] as to show that she was confused about the source of her information?
> A        No. She was able to provide narrative responses and then also differentiate a few times where other sources came from.
> Q        Okay. And you also mentioned some of the signs that you're looking for, as far as suggestibility is how a child recalls sensory memories.
>          Can you tell us more about that?
> A        Yes. So in general, children who provide more details that speak to sensory information, like "I heard this" or "I saw this," that also helps differentiate between — or help with suggestibility. They're not just taking on a statement. They're able to provide that information and describe it, so describing, like, the stomping and the language that [Maldonado] spoke in. *All of those things aren't*

10

*something that a child with a false memory typically would
remember.*

> Q      So are you saying that the details of the sensory
> feelings are important to help distinguish whether or not it could be
> a false memory?
>
> A      Again, I don't make that determination, but in
> interviewing, yes, that's what we use to help when a child makes a
> statement and I'm asking for more information.  If they're not able to
> provide more information or more details or any sensory
> information, that might be a cause of concern for me of where that
> information is coming from.  Was it just something that they're told
> and able to repeat and not produce any additional details on their
> own accord?  Yes.
>
> Q      Did you have any concerns as to [J.L.]'s ability to
> provide sensory details in this interview?
>
> A      I didn't have any concerns.[8]

McDonald argues that Scott's statement, "All of those things aren't

something that a child with a false memory typically would remember," amounts

to "improper opinion testimony vouching for [J.L.]'s credibility."  But, viewed in

context, Scott's testimony related to how she conducts forensic interviews, not

whether she believed J.L.'s testimony.

Scott was testifying as a child forensic interviewer.  So, Scott described

her training and experience in questioning children and how she applied that

training and experience to her interview with J.L.  The challenged statement

describes Scott's belief that she did not need to ask J.L. additional sensory

questions to confirm the source of her memory because J.L.'s description of the

incident was sufficiently detailed.  Testimony about how and why Scott asked

certain questions in the interview was relevant to assessing the integrity of her

forensic interview process.  *See Kirkman*, 159 Wn.2d at 930-31 (a detective's

---

[8] Emphasis added.

testimony about how he " 'tested [a victim]'s competency and her truthfulness' " in a child interview was " 'merely provid[ing] the necessary context that enabled the jury to assess the reasonableness of the . . . responses' ")[9] (quoting *State v. Demery*, 144 Wn.2d 753, 764, 30 P.3d 1278 (2001)).  The testimony was not an opinion about J.L.'s credibility.  Indeed, Scott testified both before and after the statement that as a forensic interviewer, she does not determine whether J.L. "was having a false memory."[10]

Because the challenged statement does not amount to witness vouching, McDonald fails to show that the court would have sustained an objection.  As a result, Will was not ineffective for choosing not to object to the testimony.

4.  Failure to Call Expert Witness

Finally, McDonald argues that Will was deficient for not calling a memory and source monitoring expert because such an expert could have refuted Scott's testimony and "explain[ed] the broader topics of memory and source confusion so critically at issue in this case."  Again, we disagree.

The right to effective assistance of counsel includes a right to experts when necessary for an adequate defense.  *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006).  But determining which witnesses to call at trial is something " 'presumed to be a matter of legitimate trial tactics.' "  *State v.*

_____

[9] Second alteration in original.

[10] We note that it was also a reasonable strategic choice for Will not to object and emphasize damaging testimony sandwiched between Scott's testimony that she could not say whether J.L.'s disclosure flowed from a false memory.  So, even if the testimony were inadmissible, McDonald fails to show how there was no " '*legitimate* trial strategy or tactics' " behind Will's failure to object.  *Davis*, 152 Wn.2d at 714 (quoting *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002)).

*Bogdanov*, 27 Wn. App. 2d 603, 634, 532 P.3d 1035[11] (quoting *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 545, 397 P.3d 90 (2017)), *review denied*, 2 Wn.3d 1008, 539 P.3d 4 (2023). A petitioner must overcome the presumption of competence "by showing counsel failed to conduct appropriate investigations to determine what defenses were available, adequately prepare for trial, or subpoena necessary witnesses." *Davis*, 152 Wn.2d at 742.

Here, the record shows that Will reviewed the video and transcript of J.L.'s forensic interview; interviewed J.L.; questioned Scott at the child hearsay hearing; researched the fields of memory, source monitoring, and suggestibility; and consulted a memory expert. Only then did he decide not to call an expert witness. Instead, Will decided that cross-examination of Scott would best forward McDonald's defense and undermine the State's case-in-chief. This was not unreasonable. *See Lui*, 188 Wn.2d at 545 (finding that it was not unreasonable for trial counsel to challenge the State's expert testimony solely via cross-examination).

In support of his argument that Will's choice not to call an expert witness was unreasonable, McDonald provides the declarations of criminal defense attorney Amy Muth and psychologist Dr. Carr. In Muth's opinion, "it [is] imperative to have a memory expert" when, as here, the defense is "the complainant dreamed the assault." And Dr. Carr declares that she "could have testified" that memory errors exist in children well beyond the preschool years and applied her knowledge of source monitoring and suggestibility to J.L.'s

---

[11] Internal quotation marks omitted.

accounts of the rape and other discovery. But the declarations do not show that Will's choice was unreasonable. There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. And a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id*.

In any event, Will successfully elicited from Scott that she could not say whether J.L.'s disclosure resulted from a dream. And Dr. Carr does not assert that she could have testified J.L.'s disclosure did flow from a false memory. Will's decision not to call an expert witness was informed and reasonable.

McDonald fails to show ineffective assistance of counsel.[12] As a result, we deny his petition.

Bowman, J

WE CONCUR:

Chung, J.

Dwyer, J.

---

[12] Because McDonald fails to show his attorney was deficient, we do not reach *Strickland*'s prejudice prong. 466 U.S. at 697.